FILED

2006 Mar-31  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

ROY MACK WEST,                    ]
                                  ]
      Movant,          ]
                                  ]
vs.                               ]      CV-03-WMA-RRA-8003-S
                                  ]      CR-95-WMA-RRA-0091-S
                                  ]
THE UNITED STATES OF AMERICA,     ]
                                  ]
      Respondent.      ]

## <u>MEMORANDUM OPINION</u>

This is a motion to vacate, set aside, or correct a sentence, brought by a federal prisoner, pursuant to 28 U.S.C. § 2255. The movant, Roy Mack West, was convicted in this court on August 23, 1995, of one count of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848 (Count 1) and one count of being a member of the underlying drug conspiracy, in violation of 21 U.S.C. §§ 846 and 841(a)(1)(Count 2). West was sentenced on November 2, 1995. At the sentencing hearing, the court vacated the conviction under Count 2 pursuant to *United States v. Nixon*, 918 F.2d 895 (11th Cir. 1990), and sentenced West to life imprisonment under Count 1.

On appeal, West claimed that: 1) the trial court erred in failing to dismiss the indictment under the Speedy Trial Act; 2) the trial court abused its discretion in admitting the notebook discovered at the house in Pelham, Alabama, that memorialized drug transactions; 3) the trial court erred when it instructed the jury about the notebook; 4) the trial court should have dismissed the indictment based on a violation of the statute of limitations; 5) the trial could should have dismissed the indictment because it alleged a single conspiracy instead of multiple conspiracies; 6) the trial

court erred in denying his motion for a mistrial; 7) the trial court erred in admitting the testimony of Geving, or in failing to issue a limiting instruction; 8) the trial court erred in denying his motion for a judgment of acquittal; 9) the trial court erred in its jury instructions; and 10) the trial court erred in imposing a mandatory life sentence.

The Eleventh Circuit Court of Appeals affirmed West's conviction, finding that he "validly waived his speedy trial rights, and the court relied on it and other factors in rescheduling a trial to a date beyond the expiration of the seventy-day period," and that "the district court committed harmless error in admitting the notebook as a coconspirator's statement and its subsequent instruction to the jury on that subject." *United States v. West*, 142 F.3d 1408, 1413 & 1415 (11th Cir. 1998)(West 1). The Court of Appeals affirmed on issues 4 through 10 without discussion. *Id.* at 1412, n.3.

The United Stated Supreme Court vacated the judgment of the appeals court, and remanded the case to the United States Court of Appeals for the Eleventh Circuit "for further consideration in light of *Richardson v. United States*, 526 U.S. 813, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999)." *West v. United States*, 526 U.S. 1155 (1999).

On remand, the Eleventh Circuit Court of Appeals found the following:

In *Richardson*, the Supreme Court held that "a jury in a federal criminal case brought under [21 U.S.C.] § 848 must unanimously agree not only that the defendant committed some 'continuing series of violations' but also that the defendant committed each of the individual 'violations' necessary to make up that 'continuing series.'" 526 U.S. at ----, 119 S. Ct. at 1709.

West was convicted of both conducting a continuing criminal enterprise ("CCE") (Count 1) and being a member of the underlying drug conspiracy (Count 2). At sentencing, the court vacated Count 2 as a lesser included offense of the CCE conviction. *See United States v. Nixon*, 918 F.2d 895, 908 (11th Cir.1990)(when defendant convicted on both a CCE count and a conspiracy count, the Court will merge the two offenses by vacating the conviction of the lesser included conspiracy

count).  The government concedes that the jury instruction given was not in accord
with the requirements of Richardson and that West's conviction on the CCE count
cannot stand, *see also United States v. Riley*, No. 96-4653, 161 F.3d 20 (11th Cir.
1998)(unpublished), and requests that this Court remand to the district court with
instructions to reinstate the vacated drug conspiracy count and resentence West.

*United States v. West*, 201 F.3d 1312 (11th Cir. 2000)(West 2).  The court vacated West's CCE

conviction and remanded the case to this court "with instructions to reinstate West's conspiracy

conviction under Count 2 and resentence him."  *Id.*

By order entered May 16, 2000, the district court reinstated West's conviction under Count

2 and set a sentencing hearing for May 18, 2000.  At the sentencing hearing, the court sentenced

West to a term of imprisonment for 400 months, to be followed by a 5-year term of supervised

release.  West filed a motion for retrial of indictment and a motion for a new trial, both of which

were denied.

West appealed the conviction under Count 2, and the 400-month sentence, claiming that: 1)

the indictment should have been dismissed for violating the statute of limitations; 2) the time for trial

had expired under the Speedy Trial Act of 1974, and he did not waive his right to a speedy trial; 3)

the consolidation of multiple conspiracies into a single conspiracy count violated his right to due

process; 4) the trial court erred in reinstating his conspiracy conviction under 21 U.S.C. § 846,

pursuant to the mandate of the court of appeals; 5) the trial court erred in denying his motion for a

new trial; and 6) he was entitled to a jury finding of drug quantity, in light of *Apprendi v. New*

*Jersey*, 530 U.S. 466 (2000).  The Eleventh Circuit Court of Appeals affirmed the conviction and

sentence in an unpublished opinion issued on June 29, 2001.  *United States v. West*, 264 F.3d 1145

(11th Cir. 2001)(table)(West 3).  The opinion was issued as a mandate on November 6, 2001.

West filed the current motion to vacate on January 21, 2003.  In support of his motion, West claims that he was not provided with effective assistance of counsel by his three attorneys, G. Douglas Jones, Richard S. Jaffe, and Robert B. French, Jr., because: 1) his attorneys represented him despite having a conflict of interest that was not revealed to West; 2) they did not adequately inform him of the charges against him; 3) they did not adequately advise him before he agreed to waive his right to a speedy trial; 4) they failed to request a jury charge on multiple conspiracies; 5) they failed to request a charge on manufacturing marijuana and methamphetamine; 6) Mr. French did not "attend to the business of representing his client" because he was "typing on a laptop computer writing a book about the trial"; and 7) because they failed to object to improper venue.  West also claims that 8) he did not voluntarily waive his right to a speedy trial.

In response to the court's order to show cause, the respondent has filed an answer in which it argues that the motion is due to be dismissed because it is successive and because it is barred by the statute of limitations, and that the claims are without merit.  West has filed a reply to the government's response to the order to show cause.

## STATUTE OF LIMITATIONS AND SUCCESSIVENESS

The respondent argues that this § 2255 motion is barred by the statute of limitations and as a successive motion to vacate.  Effective April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") made several changes in the law relating to habeas corpus procedure. The AEDPA amended 28 U.S.C. § 2255 to read in part, as follows:      A 1-year period

of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of —

> (1) the date on which the judgment of conviction becomes final;

> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

The respondent admits that the motion was timely filed with respect to the finality of the conviction in *West 3*.[1]  The respondent goes on to argue that:

> However, this petition was only timely as to issues that were still properly before the court during the *West 3* appeal.  The court directly stated that was only true of the *Apprendi* issue.  *West 3*, p. 6.  This petition contains no *Apprendi* issues thus there is nothing properly before the court at this time.
>
> All of the other issues raised by West should have been the subject of the direct appeal from West's conviction in *West 1* and a timely § 2255 petition therefrom.  Much as the court was disinclined to permit West to continue to revisit previously raised issues under the rubric of the *West 3* appeal, this court should decline to permit West to raise issues for the first time on a § 2255 motion some 8 years after trial.  With the exception of *Apprendi* issues, West was required, as is every other movant, to file his § 2255 petition within one year from the date his conviction became final.  Because of the complex appellate process, this occurred after the Eleventh Circuit directed the district court to enter judgment on the conspiracy count, and the court did so, sentencing West to 400 months on that count

---

[1] The Eleventh Circuit Court of Appeals' decision in *West 3* was final on November 6, 2001, when the mandate was issued.  The one-year limitations period began to run ninety days later, on February 4, 2002, when the time in which West could have filed a petition for a writ of certiorari in the United States Supreme Court expired.  The limitations period expired on February 4, 2003.  West's motion to vacate was timely filed on January 21, 2003.

on May 18, 2000.  West, as the Eleventh Circuit noted in *West 3*, Exhibit B at 5, did
not file a motion for a rehearing en banc in *West 2* nor did he appeal to the Supreme
Court.  Thus, his conviction became final at that time, and he had one year from the
expiration of the time he had to petition for certiorari in which to file a § 2255
proceeding.  The Eleventh Circuit issued its decision on January 26, 2002, thus West
had 90 days or until March 27, 2002 to file a § 2255 petition relating to his
prosecution.  Because he failed to do so, all claims other than *Apprendi* claims, which
have not been made, are time-barred and should be dismissed.

*Government's Response to § 2255 Motion*, pp. 9-10.

West's motion is not barred by the statute of limitations.  The Eleventh Circuit Court of
Appeals has noted that in the context of a § 2254 petition, "the statute of limitations runs from the
date of state resentencing and not the date of the original judgment."  *Maharaj v. Secretary for the
Department of Corrections*, 304 F.3d 1345, 1348 (11th Cir. 2002), *citing Hepburn v. Moore*, 251 F.3d
1208, 1209 (11th Cir. 2000)(per curiam).  In deciding *Maharaj*, the Eleventh Circuit relied upon
*United States v. Colvin*, 204 F.3d 1221 (9th Cir. 2000), in reaching its decision that the petition was
not ripe for review because the petitioner had not been resentenced.

In *Colvin*, the petitioner had been convicted of one count of conspiracy to
distribute cocaine and three counts of aiding and abetting in the distribution of
cocaine.  Colvin appealed his convictions, and the Ninth Circuit affirmed in part and
reversed in part.  On remand, the district court amended the judgment, and Colvin
immediately filed a motion to vacate under 28usc § 2255.  When Colvin filed his
habeas petition, the time to appeal the district court's amended judgment had not yet
elapsed.  The Ninth Circuit held that, in a case in which an appellate court partially
or wholly reverses a defendant's conviction or sentence and remands to the district
court, the petitioner's "judgment does not become final, and the statute of limitations
does not begin to run, until the district court has entered an amended judgment and
the time for appealing that judgment has passed."  *Colvin*, 204 F.3d at 1225.  The
Ninth Circuit reasoned that this bright-line approach was easy to follow, would avoid
speculation and litigation about the finality of the judgment, would allow defendants
to exhaust their appeals on direct review before bringing collateral attacks, and
comported with that court's rule that a district court lacks authority to entertain a
habeas petition while direct review is pending.  *Id.* at 1225-26.  We agree.

-6-

*Maharaj*, 304 F.3d at 1349.  Using the reasoning of the courts in *Colvin* and *Maharaj*, it is clear that

the statute of limitations did not begin to run until Mack's conviction became final **after** he was

resentenced.  As previously discussed, West's conviction became final on November 6, 2001, when

the mandate was issued in *West 3*.  The one-year limitations period began to run ninety days later,

on February 4, 2002, when the time in which West could have filed a petition for a writ of certiorari

in the United States Supreme Court expired.  The limitations period expired on February 4, 2003.

West filed his motion to vacate on January 21, 2003.  Therefore, it was timely filed.

Likewise, the motion is not barred as successive.  In addition to enacting a statute of

limitations in § 2255 actions, the AEDPA also amended 28 U.S.C. § 2244 to read in part, as follows:

> (a) No circuit or district judge shall be required to entertain an application for a writ of habeas corpus to inquire into the detention of a person pursuant to a judgment of a court of the United States if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus and except as provided in section 2255.
> . . .
> (b)(3)(A)  Before a second or successive application permitted by this section is filed in district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

Section 2255 provides:

> A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain --
> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable. One of the changes was an amendment to 28 U.S.C. § 2244(b) that added the following provision:
> (3)(A) Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

The clear effect of this provision is to establish a statutory pre-condition to the filing of a "second or successive" motion to vacate, requiring the applicant to obtain the authorization of the United States Court of Appeals for the Eleventh Circuit before it is filed in the district court.  The purpose of the statute is to prevent the filing of successive motions and to deprive the district court of jurisdiction to consider successive motions unless and until it has been authorized by the appropriate court of appeals.  The new restrictions on successive motions apply to the second motion even if the first motion was denied prior to the effective date of the AEDPA.  *In re Medina*, 109 F.3d 1556, 1561 (11th Cir. 1997).

The respondent argues that the motion is successive because West's motions for new trial, filed after he was resentenced, "could potentially be denominated as habeas petitions."  However, it is clear that at the time the motions were filed, West's conviction was not final and a § 2255 motion would have been premature.  *See Maharaj*, 304 F.3d at 1349 and *Colvin*, 204 F.3d at 1225. This is clearly West's first motion to vacate his conviction, so it is not barred as a successive motion.


## PROCEDURAL DEFAULT


West claims that he never made a knowing and voluntary waiver of his speedy trial rights. He argues that although he executed a waiver of his speedy trial rights, he was not aware of what those rights were and they were not explained to him by counsel.  On direct appeal from the original conviction, West argued that the trial court erred in failing to dismiss his indictment under the Speedy Trial Act.  Specifically, he argued that the waiver was not knowing and intelligent because he and his lawyer executed it beyond the limits of the act, and because the court failed to make a

-8-

specific "ends of justice" finding in granting the government's motion for a continuance of the trial. *West 1*, 142 F.3d at 1412. The appeals court found that "West validly waived his speedy trial rights, and the court relied on it and other factors in rescheduling a trial to a date beyond the expiration of the seventy-day period." *Id*. at 1413.

It does not appear that the speedy trial claim currently being raised by West is the same as the claim he raised on appeal in *West 1*.[2] Therefore, West's claim that he never made a knowing and voluntary waiver of his speedy trial rights is barred by procedural default. "In general, a defendant must assert an available challenge to a sentence on direct appeal or be barred from raising the challenge in a section 2255 proceeding." *Greene v. United States,* 880 F.2d 1299, 1305 (11th Cir. 1989), *cert. denied*, 494 U.S. 1018 (1990). "A ground of error is usually 'available' on direct appeal when its merits can be reviewed without further factual development." *Mills v. United States,* 36 F.3d 1052, 1055 (11th Cir. 1994). If a defendant fails to pursue an available claim on direct appeal, he is barred from presenting the claim in a motion for § 2255 relief unless he can establish cause for the default and actual prejudice resulting from the alleged error. *Id. See also Cross v. United States,* 893 F.2d 1287, 1289 (11th Cir.), *cert. denied,* 498 U.S. 849 (1990). "[A] prisoner collaterally attacking his conviction can establish cause for a procedural default if he can show that 'some objective factor external to the defense impeded counsel's efforts to comply with the . . . procedural rule,' or that his attorney's performance failed to meet the *Strickland* standard for effective assistance of counsel." *Reece v. United States*, 119 F.3d 1462, 1465 (11th Cir. 1997). In addition to showing

---

[2] The court notes that to the extent that it could be argued that this claim was included in the speedy trial claim raised by the movant on appeal in *West 1*, the claim is procedurally defaulted because it has already been decided against him. *See United States v. Rowan*, 663 F.2d 1034, 1035 (11th Cir. 1981)(court "not required on § 2255 motions to reconsider claims of error raised and disposed of on direct appeal").

cause, the movant must also demonstrate that he was prejudiced.  To show prejudice, he must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." (emphasis in original).  *United States v. Frady*, 456 U.S. 152, 170  (1982).  A federal habeas court, however, will consider a procedurally defaulted claim in the absence of cause, if a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent." *Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (*quoting, respectively, Engle*, 456 U.S. at 135, and *Murray,* 477 U.S. at 496).

The petitioner has made no attempt to establish cause and prejudice to excuse the procedural default of his speedy trial claim.[3]  Nor has he alleged facts to support the "fundamental miscarriage of justice" exception.  Therefore, West is procedurally barred from raising his speedy trial claim in this court, and the claim is due to be dismissed.

## INEFFECTIVE ASSISTANCE OF COUNSEL

West was represented at trial by attorneys G. Douglas Jones, Richard S. Jaffe, and Robert B. French, Jr.  He alleges that his attorneys did not provide him constitutionally effective assistance of counsel.  Specifically, West claims that: 1) his attorneys represented him despite having a conflict of interest that was not revealed to West; 2) they did not adequately inform him of the charges against him; 3) they did not adequately advise him before he agreed to waive his right to a speedy

---

[3]  Although West has raised as a separate claim, that his attorneys were ineffective for failing to adequately advise him before he agreed to waive his right to a speedy trial, he has not tried to excuse his failure to raise this claim that on appeal by showing some external cause for his procedural default.  Thus, the current speedy trial claim is due to be dismissed and the court will instead address the movant's separate claim that his attorneys were constitutionally ineffective for failing to adequately advise him before he agreed to waive his right to a speedy trial.  *See Reece v. United States*, 119 F.3d 1462, 1465 (11th Cir. 1997).

trial; 4) they failed to request a jury charge on multiple conspiracies; 5) they failed to request a

charge on manufacturing marijuana and methamphetamine; 6) Mr. French did not "attend to the

business of representing his client" because he was "typing on a laptop computer writing a book

about the trial"; and 7) because they failed to object to improper venue.

The United States Supreme Court has established a national standard for judging the

effectiveness of criminal defense counsel under the Sixth Amendment. "The benchmark for judging

any claim of ineffectiveness must be whether counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied upon as having produced a just

result." *Strickland v. Washington*, 466 U.S. 668 (1984). The Court elaborated:

> A convicted defendant's claim that counsel's assistance was so defective as to require
> reversal of a conviction or death sentence has two components. First, the defendant
> must show that counsel's performance was deficient. This requires showing that
> counsel made errors so serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment. Second, the defendant must
> show that the deficient performance prejudiced the defense. This requires showing
> that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable.

*Strickland*, 466 U.S. at 687. "Because the [petitioner] must prove both deficiency and prejudice, a

[petitioner's] failure to prove either will be fatal to his claim." *Johnson v. Scott,* 68 F.3d 106, 109

(5th Cir. 1995).

Under the *Strickland* test, the petitioner must initially show that counsel's representation fell

below an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "While it need not

be errorless, counsel's advice 'must be within the realm of competence demanded of attorneys

representing criminal defendants.'" *Jones v. White*, 992 F.2d 1548, 1557 (11th Cir. 1993)(*quoting*

*Stano v. Dugger*, 921 F.2d 1125, 1151 (11th Cir.)(en banc), *cert. denied*, 502 U.S. 835 (1991)). In

making such an evaluation, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. The effectiveness or ineffectiveness of counsel must be evaluated by consideration of the totality of the circumstances. *Stanley v. Zant,* 697 F.2d 955, 962 (11th Cir. 1983), *cert. denied,* 467 U.S. 1219 (1984).

The second requisite element in a claim of ineffective assistance of counsel is a showing of prejudice. Even if counsel made an error so egregious as to be outside the broad scope of competence expected of attorneys, a movant can obtain relief only if the error caused actual prejudice. *Strickland,* 466 U.S. at 691-92. In order to establish "actual prejudice, a petitioner must show that "there is a reasonable probability that but for the attorney's unprofessional errors, the result of the proceeding would have been different." *Armstead v. Scott,* 37 F.3d 202, 207 (5th Cir. 1994). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. *Strickland,* 466 U.S. at 694. Furthermore, in addition to showing that the outcome would have been different, a petitioner must prove that "counsel's deficient performance caused the outcome to be unreliable or the proceeding to be fundamentally unfair." *Armstead v. Scott,* 37 F.3d 202, 207 (5th Cir. 1994)(*citing Lockhart v. Fretwell*, 113 S. Ct. 838, 844 (1993)). "In other words, a 'counsel's unprofessional errors [must] so upset the adversarial balance between the defense and prosecution that the trial was rendered unfair and the verdict suspect.'" *Weekley v. Jones*, 56 F.3d 889, 897 (8th Cir. 1995)(*quoting Fretwell*, 113 S. Ct. at 842). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Fretwell*, 113 S. Ct. at 844.

West first claims that his attorneys were ineffective because they represented him despite having a conflict of interest that was not revealed to him.  Specifically, West claims that:

> (a) At the time of Mr. West's arraignment in this case and for some time thereafter his lead counsel Robert B. French was under investigation by the office of the United States Attorney that was prosecuting Mr. West.  Mr. West was informed by Mr. French that the United States Attorney was seeking to indict him or had brought a sealed indictment against him.  Mr. West was told by Mr. French that Mr. West's case was the first federal case he had handled in the United States District Court in Birmingham, AL because "they would not let him."  Mr. West was never informed that the proceedings against Mr. French could give rise to a possible conflict in his representation of Mr. West.  The court was never informed of this situation and Mr. West never made a knowing and voluntary waiver of his right to proceed with counsel that was not laboring under this type of conflict.
>
> (b) At the time of his arraignment and for some time thereafter Mr. West's two other attorney's [sic], G. Douglas Jones and Richard S. Jaffe were representing Robert B. French in the proceedings against Mr. French by the office of the United States Attorney that was prosecuting Mr. West.  Mr. West was informed of the situation but was never informed that it created a possible conflict of interest.  The court was never informed of this situation and Mr. West never made a knowing and voluntary waiver of this conflict.
>
> (c) The case against Mr. West was prosecuted by Robert McGregor who was the same party who was conducting the investigation of Mr. French.  Mr. McGregor had a duty to disclose his knowledge of the conflict of interest to the court or Mr. West.  The investigation was never disclosed to the court by Mr. McGregor and Mr. West never made a knowing and voluntary waiver of this possible conflict.
>
> (d) Mr. West informed Robert French that he wished to hire Victoria Little to represent him.  Mr. French told him that it was not possible because Ms. Little had a conflict of interest because she had represented Mark West, Mr. West's nephew, in another proceeding.  Mr. French interfered with the ability of Mr. West to seek the counsel of his choice while ignoring his conflict.
>
> (e) The conflict of interest of Mr. West's attorneys had an adverse affect [sic] on th[e] performance of his counsel at critical stages of this trial.  Prior to trial[,] counsel for Mr. West conducted no meaningful plea negotiations on behalf of Mr. West.  Mr. West's counsel did not advance the theory of multiple conspiracies in his defense even though that defense was reasonable and supported by the facts of the case.  Mr. West's counsel advanced no theory of defense that would reasonably lead to an acquittal of Mr. West.

*Motion to Vacate*, pp. 6-8.

In response to this claim, the respondent has submitted the notarized statement of Mr. French.[4]  In his sworn statement, Mr. French states that:

> For several years prior to my representation of Mr. West I was under investigation by the U. S. Attorney's office for the Northern District of Alabama.  I understood that I was either the target of an indictment or there was a secret indictment outstanding against me.  I do not know what the subject of the investigation or secret indictment was.  From time to time I was told that the investigation centered around dealing in illegal drugs, interfering with a federal investigation, and falsifying identification documents.  I retained three attorneys to assist me during the investigation: G. Douglas Jones, Richard Jaffe and Lloyd Copeland.  My lawyers worked diligently representing me and eventually the matter was closed.  I do not know when the investigation was terminated, but do know that Robert McGregor, Assistant United States Attorney for the Northern District of Alabama, informed me during my first court appearance on behalf of Mr. West that the file in my case had been closed.

*Affidavit of Robert French*, Civil Document 2, pp. 1-2.

The United States Supreme Court recently addressed the standard to be applied in instances involving purported conflicts of interest.  *Mickens v. Taylor*, 535 U.S. 162 (2002).  The Court held that to be entitled to relief on a Sixth Amendment claim, the defendant had to establish that the conflict of interests adversely affected counsel's performance.  *Id.*  In *United States v. Novaton*, the Eleventh Circuit Court of Appeals held:

> It is well-settled that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 1718, 64 L. Ed. 2d 333 (1980).  The Supreme Court noted in *Cuyler* that "a defendant who shows that a conflict of interest actually affected his representation need not demonstrate prejudice in order to obtain relief."  *Id.* at 349-50, 100 S. Ct. at 1719.  However, the Court emphasized that "the possibility of conflict is insufficient to impugn a criminal conviction," and that absent a showing of actual conflict and adverse effect, a defendant is not entitled

---

[4]  Although the original statement by Mr. French, submitted to the court as Exhibit C to the government's response to the motion to vacate, was not notarized, the government filed a notarized copy of that statement on March 29, 2006.

to relief. *Id.* at 350, 100 S. Ct. at 1719.  Therefore, the Supreme Court has noted that there is no "per se rule of prejudice" in all cases involving potential conflicts of interest, but instead only a rule of presumptive prejudice where an attorney "'actively represented conflicting interests' and . . . 'an actual conflict of interest adversely affected [the] lawyer's performance.'" *Strickland v. Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984) (citation omitted).

In *Freund v. Butterworth*, 165 F.3d 839 (11th Cir. 1999) (en banc), this Court discussed the two-part *Cuyler* test for reviewing claims involving conflicts of interest.  First, we noted that "[a]n 'actual conflict' of interest occurs when a lawyer has 'inconsistent interests.'" *Id.* at 859 (citations omitted).  The Court stated that:

> In order to prove that an "actual conflict" hindered [the defendant's] lawyer's performance, [the defendant] "must make a factual showing of inconsistent interests" or point to "specific instances in the record" to suggest an actual impairment of his or her interests.  Overall, the "actual conflict" inquiry is fact-specific, consistent with the [defendant's] ultimate burden "to prove that his conviction was unconstitutional."

*Id.* (citations and quotations omitted).  If a defendant is unable to show an "actual conflict," then he is not entitled to relief from his conviction because a "speculative or merely hypothetical conflict of interest does not yield a Sixth Amendment violation." *Burden v. Zant*, 24 F.3d 1298, 1305 (11th Cir. 1994).

If a defendant carries his burden of showing an actual conflict of interest, a court must then consider whether the conflict adversely affected his representation. In *Freund*, we summarized the "adverse effect" inquiry as follows:

> To prove adverse effect, a [defendant] must satisfy three elements. First, he must point to some plausible alternative defense strategy or tactic [that] might have been pursued.  Second, he must demonstrate that the alternative strategy or tactic was reasonable under the facts. Because prejudice is presumed, the [defendant] need not show that the defense would necessarily have been successful if [the alternative strategy or tactic] had been used, rather he only need prove that the alternative possessed sufficient substance to be a viable alternative. Finally, he must show some link between the actual conflict and the decision to forgo the alternative strategy of defense.  In other words, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*Freund,* 165 F.3d at 860 (citations and quotations omitted).  In the absence of a showing of an "adverse effect," prejudice is not presumed to flow from a conflict of interest. *Id.*

271 F.3d 968, 1010-11 (11th Cir.  2001), *cert. denied*, 535 U.S. 1120 (2002)

-15-

The court concludes that there was no actual conflict of interest in this case.  According to Mr. French's statement, he was told at his first court appearance with West that the government's investigation of him had been closed.  Therefore, it appears that at the time West first appeared in court represented by his three attorneys, any possible conflict from the investigation had terminated, and his attorneys knew that there was no longer the possibility that a conflict of interest existed.  There is no evidence that West's attorneys had interests that were inconsistent with his.  This claim is due to be dismissed.

West next claims that his attorneys were ineffective because they did not adequately inform him of the charges against him.  Specifically, West claims that:

> (f) Mr. West['s] counsel never adequately informed him of the charges against him.  At the time of these proceedings Mr. West was unable to read the twenty-four page indictment setting forth the charges against him.  Mr. West's counsel never inquired of his reading ability.  Mr. West['s] counsel never explained to him the numerous incidents set forth in the indictment comprising the charges against him.  Mr. West did not understand the charges against him and was unable to effectively assist in his defense.
> (g) Count two of the indictment against Mr. West charged him in a conspiracy with nineteen methods and means of carrying it out and eighty-nine overt acts.  Mr. West's counsel spent at the most ten hours speaking with him prior to the trial of the case.  This was a constitutionally deficient amount of time to prepare for such a trial.

*Motion to Vacate*, p. 8.  In his affidavit, West states that:

> he attended school to a fourth grade level and at the time his case was going on from arraignment to trial he was unable to read a newspaper.
> Affiant further states he was unable to read the content of documents he received from his attorneys during preparation of his case and trial.
> Affiant further states his trial attorneys did not know of his difficulty reading and never asked him any questions about his educational level or reading ability.
> . . .
> Affiant further states that his attorneys spent approximately 10 hours total with him in preparation for trial.

*West Affidavit*, pp. 2 and 4.

-16-

In response to this claim, Mr. French states in his sworn statement:

> I personally sat down with Mr. West and with my associate, Robert Ray, and together we went through every word of the facts and charges the government was using against him.  I was unaware he had difficulty reading and did not ask him to read any portion of the government's case.  I believe I left a copy of the data with him and told him to review it and give me any additional information he could develop.  At the time we reviewed the government's case with Mr. West, we kept notes and asked his response to each and every fact cited.  His assistance allowed us to identify incarcerated witnesses against him as well as provided valuable information about persons who were not in custody and were expected to testify for the government.
>
> I am unaware of the total time I spent with Mr. West while interviewing him in custody in Birmingham.  Perhaps 10 hours is accurate.  I may have visited Mr. West once or twice when Robert Ray was not with me.  I tried to always bring Robert Ray to insure that I obtained accurate and necessary information from Mr. West.  Usually, we were working from notes or check lists.  Robert Ray is admitted to practice in Washington State, New York and Alabama.  He is a very competent researcher and an experienced trial counsel.  Mr. Ray participated in almost every aspect of the defense of Roy Mack West.  I personally spent more than 300 hours in the defense and appeal of Mr. West and I am sure Robert Ray spent almost that much time in the process.

*Affidavit of Robert French*, Civil Document 2, pp. 3-4.

West claims that his attorneys were ineffective because they did not adequately inform him of the charges against him.  In support of this claim, he states that he was unable to read a newspaper at the time of trial and that his attorneys never explained the indictment to him,  so he did not understand the charges against him and was unable to effectively assist in his defense.  However, the record does not support these claims.  Although West maintains in his affidavit that he was not able to read the documents he received from his attorneys during preparation for the trial, he has not stated that his attorneys did not explain the details of the indictment to him, that he did not fully understand the charges against him, or that he was not able to effectively assist in his defense.  However, Mr. French states in his affidavit that when he and his associate met with West, they "went through every word of the facts and charges the government was using against him."  He adds that

-17-

while they reviewed the case with West, they "kept notes and asked his response to each and every fact cited."  Mr. French also states that West's assistance allowed them to identify incarcerated witnesses against him and that he provided other valuable information to them.  According to West, Mr. French spent approximately 10 hours with him, going though the charges in preparation for the trial.

West has failed to establish that his attorneys were deficient in failing to adequately inform him of the charges against him.  West was clearly well-informed as to the charges against him, despite his alleged illiteracy at the time of trial, and he was well-equipped to aid in his defense.[5] Additionally, the court notes that West has not shown any prejudice in regard to this claim.  This claim is due to be dismissed.

West further claims that his attorneys were constitutionally ineffective because they did not adequately advise him before he agreed to waive his right to a speedy trial.  Specifically, he claims that:

> (h) The waiver of Mr. West's right to a speedy trial was done on the advice of counsel without an explanation of those rights to Mr. West allowing Mr. West to make an informed decision.  At the time the waiver was executed it was not in Mr. West's interests.  There was no strategical basis to waive the right of Mr. West to a speedy trial.  This waiver prejudiced Mr. West['s] right to force the government to trial when they were not prepared to bring evidence to prove all of the elements of the charges against Mr. West beyond a reasonable doubt.

*Motion to Vacate*, p. 8

In response to this claim, Mr. French states in his affidavit:

---

[5]  To the extent that West might be claiming that his attorneys did not spend enough time preparing for trial, the court finds that claim to lack merit.  West claims that his attorneys only spent 10 hours preparing for trial, based on his estimation that Mr. French spent 10 hours with him personally, in preparation for trial.  However, it is undisputed that Mr. French himself spent at least 300 hours preparing for the trial.  That does not include the time put into trial preparations by Mr. French's assistant Robert Ray, or West's other two retained attorneys.

The waiver of Mr. West's right to a speedy trial was done more for the defense than for the government. We had to visit the Hamilton County Jail on several occasions to interview co-defendant Leroy Steve Wofford. We investigated George Robert Booth, Harold Hall, Lawrence Robert Duncan, Robert Douglas Williams, Edward D. Perkins, Elizabeth Meadows, Lloyd D. Shipley, James Brennan, Patsy Whited, Sammy Workman, Woodrow Workman, Linda Quinonez, Claude Wayne Cole, Jack Dryden, Mark West, Jerry Jenkins, Paul Geving, Bruce Dobbins, Enid Cressen and others. Since many of the government witnesses were in prison or out of state, numerous trips had to be made. I visited the State of Tennessee several times, I went to Bruce Dobbins' garage in Ringgold, GA. I went to Bessemer and investigated Doug Williams and a contractor named Patton. Tracing some of the suspected government witnesses took days of investigation. Wayne Cole and the East Alabama connections took traveling to those sites and talking to knowledgeable persons. Usually, we had very little to go on and many potential witnesses that we investigated did not appear at the trial. At one time we began tracing Mr. West's travels while he was a fugitive. We followed him to a fishing camp in Southwest Alabama, to Bat Cave, North Carolina and to some place in Arkansas whose name escapes me. I believe it was near Pine Mountain Airport. After the backwoods Arkansas trip, we decided that tracking Mr. West was unproductive. Based upon the information that we had accumulated, we developed profiles and strategies for the potential witnesses and crafted questions for cross-examination. Although Robert Ray and I were working almost full time for Roy Mack West, there was still not enough time to gather all the information we wanted about the government's case. However, I believe we had enough for a thorough and sifting cross-examination of the most important witnesses against Mr. West.

*Affidavit of Robert French*, Civil Document 2, pp. 4-5.

Even assuming that West had no understanding of what his rights to a speedy trial were, his attorneys were not deficient in advising him to waive those rights. It is clear that in a case this large, the defense simply needed more time to prepare for trial that it would have had if he had not waived his speedy trial rights. It was in West's best interests that his speedy trial rights were waived. Moreover, there is nothing to indicate that West suffered any prejudice as a result of the waiver of his speedy trial rights. This claim is due to be dismissed. West's next claim is that his attorneys were constitutionally ineffective because they failed to request a jury charge on multiple conspiracies. Specifically, he contends that:

(i) Trial counsel failed to request that the jury be charged on the law of multiple conspiracies when based upon the evidence this was the only logical theory of defense for Mr. West.  This action was taken without any valid strategic reason.

(j) After the charge to the jury[,] trial counsel failed to object to the omission of a charge on multiple conspiracies.  The charge was supported by the evidence in the case and was Mr. West['s] best defense.  Failure to object to this omission in the charge was taken without any valid strategic reason.

*Motion to Vacate*, pp. 8-9.

The indictment charged that West and several of his co-defendants:

did knowingly and willfully conspire and agree with each other and with others who identities are both known and unknown to the Grand Jury, to possess with the intent to distribute and to distribute marijuana, cocaine and methamphetamine, controlled substances, and also to manufacture marijuana and methamphetamine all in violation of Title 21, Unites States Code, Section 846.

**PURPOSE**

The purpose of the conspiracy was to distribute, possess with the intent to distribute, manufacture, and possess with the intent to manufacture, marijuana, methamphetamine, and cocaine.

*Second Superseding Indictment*, Criminal Document 81, pp. 3-4.  In its conspiracy charge to the jury,

the court instructed the jury as follows:

So you know now what the definition of a conspiracy is as described in the code section that's invoked on conspiracies, 846.  And you know that it's not necessary that any of the objects of the conspiracy be accomplished.  That means that there need be no overt act in furtherance of the conspiracy, as long as there is **an agreement with two or more people, one of whom has to be the defendant, to accomplish, in this case, the possession of a controlled substance with intent to distribute.**

*Trial Transcript, Volume XII*, Criminal Document 163, p. 2366.  (emphasis added).  This instruction

clearly required the jury to find that West was a member of the conspiracy charged in the indictment

and not a member of some other conspiracy.  Therefore, there was no need for West's attorneys to

request a charge on multiple conspiracies or to object to the court's failure to give a multiple

conspiracy charge.  The attorneys were not deficient in failing to request a multiple conspiracy charge or object to the court's failure to give the charge.  Furthermore, the defense was not prejudiced by the absence of this charge, since the jury received the appropriate information in the conspiracy charge it was given.  This claim is due to be dismissed.

West further claims that his attorneys were ineffective because they failed to request a jury charge on the definition of manufacturing.  In support of this claim, West argues that:

> (k) One of the conspiracy charges in the indictment against Mr. West was the manufacture of marijuana and methamphetamine.  During the charge to the jury the court did not charge on the legal definition of manufacturing.  Even though this was an essential element of the charges against Mr. West, trial counsel did not object to this omission in the charge to the jury.

*Motion to Vacate*, p. 9.  Title 21 U.S.C. § 802(15) defines "manufacture" as follows:

> The term "manufacture" means the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of such substance or labeling or relabeling of its container; except that such term does not include the preparation, compounding, packaging, or labeling of a drug or other substance in conformity with applicable State or local law by a practitioner as an incident to his administration or dispensing of such drug or substance in the course of his professional practice.

Even assuming that West's attorneys were ineffective for failing to object to the court's failure to instruct the jury as to the legal definition of "manufacture," there is simply no evidence that the defense suffered any prejudice as a result.  West makes no allegation that his defense suffered and there is nothing in the record to indicate that the jury did not understand the meaning of the word "manufacture," that they were confused by their lack of a legal definition, or that their verdict would have differed in any way had they been charged on the definition.  This claim is due to be dismissed.

West also claims that he received ineffective assistance of counsel because Mr. French did not "attend to the business of representing his client" because "[t]hroughout the course of the trial . . . during the presentation of evidence and argument before the court," he was "typing on a laptop computer writing a book about the trial." *Motion to Vacate*, p. 9.  West asserts that Mr. French referred to this fact in his closing argument and "made it the theme of his closing argument." *Id*. He adds that this "constituted a complete and abject failure of Mr. French to attend to the business of representing his client, similar to an attorney sleeping during trial." *Id*.

In his affidavit, Mr. French denies that he typed on a laptop computer during West's trial. He states that:

> In a trial of this magnitude I like to have dailys [sic] from the court reporter.  I asked the court reporter for this service and she said that they would not be available. Robert Ray was instructed to keep copious notes.  This was done for the purposes of cross-examination, final argument and post trial motions.   Since most of the witnesses against Mr. West were prisoners who had been given an advantage by the government for their cooperation against Mr. West, the defense formulated an attack against the bias, credibility and prejudice of these witnesses.  Mid-way through the trial, I decided that we could use our computer notes, as well as some of our pre-trial preparation as a book to be used in final argument with the request that the jury write the final chapter.  I thought this was a very effective trial tactic considering the volume of "jailhouse" testimony against Mr. West.  This summary of the trial was invaluable during the proceedings.

*Affidavit of Robert B. French, Jr.*, Civil Document 2, pp. 5-6.

In his closing argument,[6] Mr. French stated the following:

> Now, listen here.  Y'all have seen me sitting over there working all the last two weeks or so.  In any big trial somebody has got to write a book.  I wrote it. Here's your book.  I wrote it, and I named it "The Framing of a Fugitive, The Trial of Teeny May West."  Now, we have sat there and we have written 382 pages of what

---

[6] The court allowed each side two hours for closing arguments.  Mr. French and Mr. Jaffe divided the two hours allotted for the defendant's closing argument.  Mr. French made his portion of the closing argument after Mr. Jaffe had spoken for over fifty minutes.

has gone on in this courtroom, what who said – Oh.  And we wrote all about y'all.
Every one of you has got a nickname.  I won't tell you what it is.  But at any rate, we
did take note when certain people stayed awake after they had been sleeping a couple
of days.  And we know who they are, don't we, but we won't say anything.  Anyway,
but we did write a book.

And I'm going to go through the book with you, and I'm going to go through
it with you for a very good reason.  And you are going to write the end.  I have
written the beginning, I have written the testimony, I have written everything that's
gone on in it except what Robert wrote for me while I was cross-examining people,
and now you write the end.  You might not even like the name.  If you don't, maybe
we'll name it something else.  But at least we've got a book, something to remember
the trial by.

I had Robert, he's my clerk, that big, tall fellow over there . . . had Robert go
through my book over the weekend and see what he could find for me.  And he found
some good stuff that I want to share with you.

*Trial Transcript, Volume XII*, Criminal Document 163, pp. 2286-2287.  Mr. French then proceeded

to go through the "characters" in his "book," the witnesses in the trial, explaining who they were,

how they were connected to the case, and why the jury should not believe their testimony.

The court finds that even assuming that it was Mr. French who was typing notes on a laptop

computer during the trial, this did not render Mr. French's performance deficient.  Although West

concludes that the constant note-taking prevented Mr. French from "attend[ing] to the business of

representing his client," it is quite clear from the closing argument that rather than being inattentive,

Mr. French was being extremely diligent in taking detailed notes of the trial, to be used to aid in Mr.

West's defense.  The movant implies that Mr. French was writing a book in order to reap some sort

of financial benefit.  However, it is obvious from the closing statement that Mr. French described

his detailed notes as a book, to which the jury would write the ending, as an attempt at being clever

in his closing statement.  Mr. French's note-taking and the book analogy during closing argument

in no way rendered Mr. French's representation deficient.  Moreover, there is nothing to indicate that

this tactic prejudiced the defense in any way.  This claim is due to be dismissed.

West's final claim is that his attorneys were ineffective because they failed to object to improper venue.  In support of this claim, West states that:

> (m) The venue for the charges involving the New Mexico ranches was in the Eastern District of New Mexico.  There was no valid nexus between those activities and the Northern District of Alabama.  Mr. West's trial counsel made no venue objection to including these charges in the trial without any valid strategic reason.

*Motion to Vacate*, p. 9.

Even assuming that West's attorneys were ineffective for failing to object to the allegedly improper venue, West makes no allegation that he was prejudiced as a result of the venue not being changed to the Eastern District of New Mexico, or even that venue for the conspiracy offense charged in the indictment would have been proper in that district.  There is simply no evidence that the defense suffered any prejudice as a result.  This claim is due to be dismissed.

An appropriate order will be entered.

Done this 31st day of March, 2006.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

-24-